431 A.2d 915

COMMONWEALTH of Pennsylvania, Appellee

v.

Thomas J. TAYLOR, Appellant.

Supreme Court of Pennsylvania.

Submitted March 6, 1981.

Decided July 2, 1981.

James K. McNamara, Quinn, Gent, Buseck & Leemhuis, Inc., Erie, for appellant.

Michael J. Veshecco, Dist. Atty., Frank Scutella, Asst. Dist. Atty., Erie, for appellee.

Before O'BRIEN, C. J., and ROBERTS, NIX, LARSEN, FLAHERTY, KAUFMANN, and WILKINSON, JJ.

 

OPINION OF THE COURT

FLAHERTY, Justice.

This is an appeal from judgment of sentence on a criminal homicide conviction of voluntary manslaughter entered by the Court of Common Pleas of Erie County. After careful review of the record we affirm.

Taylor was convicted of voluntary manslaughter by a jury in the Court of Common Pleas of Erie County on February 22, 1975. Post-trial motions were filed, but subsequently withdrawn, and Taylor was sentenced to five to ten years imprisonment. Approximately two years later, Taylor filed a *pro se* motion with this Court requesting permission to refile post-trial motions. After a review of the record, we granted the petition, *Commonwealth v. Taylor*, 483 Pa. 60, 394 A.2d 538 (1978) and remanded to the trial court with directions to allow Taylor to file post-trial motions as if timely filed. Taylor's motion for a new trial was filed and argued. On April 2, 1980 the trial court denied the motion for a new trial. Judgment was entered on that order on April 9, 1980. This appeal followed.

The pertinent facts of the case are that on July 10, 1974 the badly decomposed body of Virginia "Baby Jane" Davison was found in her room at Frank's Hotel in Erie, Pennsylvania. Ms. Davison, approximately 62 years of age, lived by herself and frequented the bars in the immediate proximity of her hotel. A coroner's examination fixed the time of death at some time between July 5 and July 7, 1974. Death was caused by a single stab wound to the heart inflicted by a rather small pair of scissors. The body was found virtually naked lying on the bed, but there was no evidence of sexual molestation.

Police investigation established that a witness who lived in the hotel near Ms. Davison's room saw Ms. Davison entering her room in the company of Taylor on July 5, 1974. On July 11, 1974 police questioned Taylor concerning his knowledge of the Davison homicide. Taylor arrived at the Erie police station at approximately 11:00 a.m. and voluntarily signed a

waiver of rights form at 11:15 a.m. He was questioned generally by three police officers until 11:45 a.m., when he was taken to the identification division of the Erie police department, where he voluntarily gave hair samples, finger-nail scrapings, finger and palm prints. At 12:20 p.m. he was returned to the interrogation room, where he remained with the three officers until 1:00 p.m., when he requested coffee, and two of the three officers left the room to get coffee and sandwiches. They returned within ten to fifteen minutes and were told by Officer Rigazzi, who had remained with Taylor, that Taylor had confessed. The confession was subsequently introduced into evidence at the trial. The substance of the confession was that Taylor admitted killing Ms. Davison by stabbing her with scissors and leaving her nude body lying across the bed, but he did not remember the exact day of the killing.

At trial the Commonwealth introduced evidence that Taylor was seen with Ms. Davison at approximately 11:00 a.m. on July 5, 1974 entering the room of Ms. Davison. No other evidence apart from the confession linked Taylor with the crime.

Defense evidence consisted of testimony that Taylor was at work all day on July 5, 1974, including the late morning hours. Two other witnesses testified that they had seen Ms. Davison alive in a bar on the night of July 6, 1974. Other testimony established that during the period of June and July 1974 Taylor was extremely upset because of the recent death of his stepfather and that on July 3, 1974, Taylor had attempted to commit suicide by cutting his wrists, although the cuts were not serious enough to require medical treatment. Taylor's half-sister described his childhood as one in which he was cared for by his older sisters because his mother, an alcoholic, was often in bars drinking, or with various men. A clinical psychologist testified that while Taylor was a person of normal intelligence, he was not able to deal with ordinary stress and frustration.

Taylor raises five allegations of error at trial, the first of which is that the trial court erred in admitting into evidence

Taylor's confession. Specifically, the allegation is that the confession was not voluntary because of psychological pressure that was exerted by police officers during the interrogation. In *Commonwealth v. O'Bryant*, 479 Pa. 534, 537, 388 A.2d 1059, 1061 (1978), cert. den. 439 U.S. 990, 99 S.Ct. 589, 58 L.Ed.2d 664 (1978), we stated that on appeal from denial of a suppression motion:

> this Court must consider only the evidence presented by the Commonwealth and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted.... Where the suppression court's findings have ample support in the record, they may not be disturbed on appeal. (Citations omitted.)

Generally, the standard for voluntariness of confessions, articulated in *Culombe v. Connecticut*, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961), cited with approval in *Commonwealth ex rel. Butler v. Rundle*, 429 Pa. 141, 149, 239 A.2d 426, 430 (1968), is that confessions must be freely given and not the product of constraint. If a person chooses to confess, his confession may be used against him. If the confession is not freely given, however,

> if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.... The line of distinction is that at which governing self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the confession.

*Id.*

The record establishes that after Taylor was given his *Miranda* warnings and he had voluntarily waived his right to remain silent, he was questioned for roughly thirty minutes between 11:15 a.m. and 11:45 a.m. on July 11, 1975. He then went to the identification division until 12:20 p.m., at which time he returned to the interrogation room and was questioned for another forty minutes, i. e., until 1:00 p.m. At one o'clock two of the three questioning officers left the room, and upon their return ten or fifteen minutes later, they were informed that Taylor had confessed. Taylor's

testimony is that during the ten to fifteen minutes he was left alone with Officer Rigazzi, Rigazzi made reference to Taylor's mother as a "whore." On direct examination, Taylor testified as follows:

Q. What did he [Rigazzi] say about your mother?

A. Not in exact words, but in so many words he said "Tommy, you killed that woman; you stabbed her; you wanted to stab her more than once but you couldn't because you couldn't get the scissors out of her chest bone, and you stripped her to make it look like she was raped, and you did this because you were striking out at your mother, not at Baby Jane, [i. e. Ms. Davison] because your mother as well as Baby Jane is nothing but an old whore".

Q. Do you agree that there's some similarity between your mother's life style and that of Baby Jane?

A. Yes, sir. Definitely.[1]

Officer Rigazzi testified that at the time of Taylor's interrogation, he had been assigned to investigate two separate homicides, that of Virginia Davison, and that of Jeanne Phillips, both women over sixty years of age who had died of stab wounds. When Taylor was brought in for questioning concerning the Davison homicide, Rigazzi began to notice similarities in the two killings. Both victims were women similarly aged, both were stabbed, and both were seen with or seen by Taylor shortly before their respective deaths. Prior to his questioning in the *Davison* case, Taylor had voluntarily given the police a statement concerning the last time he had seen Jeanne Phillips. In addition, Rigazzi noted that there was still another similarity between the victims: they frequented bars and they had the reputation of being sexually promiscuous. Since Rigazzi had walked a beat years before in the neighborhood where Taylor grew up, he

---

1. It should be noted that Detective Rigazzi did not admit at trial that he used the word "whore" when interrogating Taylor. Rigazzi testified during the suppression hearing that he knew Taylor's mother was a "whore" but he nowhere admitted to having said this to Taylor. Rather, he insisted that during the interrogation, he pointed out to Taylor the similarities in the life styles of the victims and Taylor's mother, i. e., drinking, picking up men in bars.

also knew that the reputation of Taylor's mother was that she frequented bars in the area and was promiscuous. The truth of this reputation was established at trial both by Taylor himself and by his half-sister.

 There is no question but that it could well be police misconduct for a police interrogator to refer to a suspect's mother as a "whore." In these circumstances, however, where it has not been established that police personnel referred to Taylor's mother as a "whore", where the actual interrogation prior to confession lasted slightly over an hour, where specific references to Taylor's mother and her similarity to the murder victims occurred during a ten to fifteen minute period, and where the motivation for Rigazzi's remarks comparing the victims and Taylor's mother does not appear to have been to overwhelm the will of the suspect, but to explain to the suspect why the police felt that he may have been involved in the criminal acts under investigation, the confession was not coerced. We are aware, however, that police interrogation easily may be utilized as a mask for psychological overreaching, and where the facts of any given case suggest that psychological coercion was utilized to obtain an inculpatory statement and psychological coercion did in fact overbear the defendant's will, there will be no hesitation to suppress that statement. In the circumstances of this case, we cannot determine that the lower court's finding that the confession was voluntary did not have "ample support in the record." *Commonwealth v. O'Bryant, supra,* and we cannot, therefore, overturn that determination. The first allegation of error is denied.[2]

---

**2.** Appellant asserts also that during the interrogation he requested "help," that this amounted to a request for interrogation to cease, and that any statements made after this request are allegedly involuntary and inadmissible. The underlying assertion here is that the request for "help" is an indication that Taylor wished to terminate the interrogation and exercise his right to remain silent or to be represented by counsel. This assertion must be denied. Once again, our standard of review is to consider whether the suppression court's findings were supported by evidence presented by the Commonwealth and so much of the evidence for the defense as remains uncontradicted, *Commonwealth v. O'Bryant, supra.* The suppression court's finding, in pertinent part was: "That the defendant did ask

Appellant's remaining four assertions of error are (1) the trial court erred in admitting certain photographs and blood-stained scissors into evidence; (2) the court erred in refusing to charge that certain testimony establishing the victim's presence in a bar on July 6, 1974, if positive and unshaken, may be accepted as fact; (3) the evidence was insufficient to sustain a conviction; and (4) the court erred in permitting too much latitude in cross-examination of the defense expert witness on Taylor's personality disorder. We have examined each of these claims and find them without merit. Judgment of sentence is, therefore, affirmed.

Affirmed.

ROBERTS, NIX and LARSEN, JJ., concur in the result.

for psychiatric help *after* his admission of guilt. That no other type of help was requested at any time." The Commonwealth's evidence concerning the interrogation is that Taylor's request for help arose after he confessed to the killings and expressed a need for psychiatric help. The request, therefore, cannot be understood as a withdrawal of Taylor's *Miranda* waiver. Neither does the bare request for psychiatric help, in the circumstances of this case, mean that the will of the suspect has been overborne or that the suspect was mentally incapable of intelligently, knowingly and voluntarily waiving his right to remain silent.